# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| JAMES ANTHONY FANCHER, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:14-CV-59-PRC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff James Anthony Fancher on February 25, 2014, and a Memorandum in Opposition to Secretary's Decision Denying Plaintiff's Claim for Benefits and Request for Remand [DE 15], filed on July 3, 2014. Plaintiff requests that the November 30, 2012 decision of the Administrative Law Judge denying his claim for disability insurance benefits and supplemental security income be reversed for an award of benefits or remanded for further proceedings. On October 14, 2014, the Commissioner filed a response, and Plaintiff filed a reply on November 4, 2014. For the following reasons, the Court denies Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

Plaintiff filed applications for disability insurance benefits and supplemental security income on December 28, 2010, alleging an onset date of November 30, 2009. His initial claim was denied on May 12, 2011, and upon reconsideration on July 20, 2011. Plaintiff timely requested a hearing, which was held on October 12, 2012. In attendance at the hearing were Plaintiff, his attorney, and an impartial vocational expert. On November 30, 2012, Administrative Law Judge ("ALJ") David R. Bruce, issued a written decision denying benefits, making the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2014.

2.      The claimant has not engaged in substantial gainful activity since November 30, 2009, the alleged onset date.

3.      The claimant has the following severe impairments: hypertension, coronary artery disease, obesity, sleep apnea, arthritis, degenerative disc disease of the spine, and borderline intellectual functioning.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift and carry up to 10 pounds occasionally, lesser weights more frequently, stand and/or walk about 2 hours in an 8-hour workday and sit about 6 hours in an 8-hour workday with normal breaks. The claimant is limited to occasional overhead reaching with the left upper extremity. As far as all other directions, bilaterally he can reach constantly, including constant reaching overhead with the right upper extremity. The claimant may occasionally climb ramps and stairs, balance, stoop, kneel and crouch, but should never climb ladders, ropes, or scaffolding or crawl. The claimant is to avoid unprotected heights, moving mechanical parts, humidity and wetness, atmospheric conditions, weather, and extremes of cold or heat. The claimant is capable of avoiding normal hazards such as running into people or doorways, but he is to avoid heights and hazards. Further, the claimant is limited to simple work related decisions and tasks, defined as Specific Vocational Preparation (SVP) 1 to 2 type jobs. He may frequently interact with coworkers, supervisors, and the public but on a superficial basis, meaning that his interactions should not be an integral part of the job but they can be around people.

6.      The claimant is unable to perform any past relevant work.

7.      The claimant was born [in 1964] and was 45 years old, which is defined as a younger individual, age 45-49, on the alleged disability onset date.

8.      The claimant has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a

finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from November 30, 2009, through the date of this decision (20 CFR 404.1520(g)).

(AR 14-29).

The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

**STANDARD OF REVIEW**

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that [a reviewing court] may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski*

*v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no,

then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's residual functional capacity ("RFC"), age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC. The RFC "is an administrative assessment of what work-related activities an individual can perform despite [his] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff seeks reversal and remand for further proceedings, arguing that (1) the ALJ failed to consider Plaintiff's ankylosing spondylitis, (2) the ALJ failed to give clear and specific reasons for rejecting the opinions of the treating physicians and failed to fulfill his duty to recontact the treating physicians, and (3) the ALJ's decision is inconsistent with the RFC finding as it relates to Plaintiff's right upper extremity. The Court considers each in turn.

### A. Ankylosing Spondylitis

At step two of the disability analysis, the ALJ determined that Plaintiff had the severe impairments of hypertension, coronary artery disease, obesity, sleep apnea, arthritis, degenerative disc disease of the spine, and borderline intellectual functioning. Plaintiff faults the ALJ for failing

to consider whether his ankylosing spondylitis was a severe impairment at step two of the sequential analysis and notes that the ALJ mentioned ankylosing spondylitis just one time later in the decision.

At a December 7, 2011 office visit, the impression of Plaintiff's treating physician, Robert Buynak, M.D., was "chronic low back pain, differential diagnoses would include lumbar radiculopathy, lumbar internal disc disruption, lumbar facet syndrome, and sacroiliitis." (AR 758).[1] Dr. Buynak referred Plaintiff for a rheumatology consultation given the significant amount of sacroiliitis on the x-ray results and the positive HLA-B27 factor. *Id.* On January 18, 2012, Heather Gillespie, M.D., a rheumatologist, examined Plaintiff. She recommended x-rays of the hips and c-spine and ordered an MRI. She believed that the "likelihood of ankylosing spondylitis is high" even though she had not yet seen any of the imaging. (AR 802). A week earlier, on January 10, 2012, Dr. Buynak wrote a letter stating that Plaintiff, who had been his patient for one year, suffered from multiple medical conditions, including chronic pain as the result of osteoarthritis and ankylosing spondylitis. (AR 858).

During the January 18, 2012 visit to Dr. Gillespie, Plaintiff reported that he had progressive back pain for a year or more, as well as neck and shoulder pain. He had difficulty sleeping at night and slept in a chair. He reported that he could not "stand, sit or lay for a period of time." (AR 801). Plaintiff reported that his pain was 9 out of 10 on a scale of 0 to 10 with 10 being the most pain. Dr. Gillespie observed "very decreased range of motion on rotation" in the neck, "significantly decreased range of motion in the right hip," and "mildly decreased" range of motion in the right hip. (AR 802). Dr. Gillespie reported that Plaintiff had difficulty with mobility.

[1]The Court notes that Plaintiff incorrectly cites the pages in the record based on the Court's electronic filing date stamp in light blue at the top of each page. The proper citation to the administrative record is the stamped page number in black in the bottom right hand corner of each page. Thus, Plaintiff's page numbering is off by five additional pages (e.g. page 858 in the administrative record is cited by Plaintiff as page 863 in his brief).

In February 2012, Dr. Gillespie examined Plaintiff, who reported that his back pain was 10 out of 10. Dr. Gillespie's impressions were rule out ankylosing spondylitis, chronic pain, history of prostatitis, and hypertension. (AR 800). In April 2012, Dr. Gillespie's impressions were "suspect ankylosing spondylitis," chronic pain, history of prostatitis, and coronary artery disease. (AR 799).

The next record from Dr. Gillespie is dated August 29, 2012. Among the listed problems at that time was ankylosing spondylitis. Plaintiff reported that he had been off of Enbrel (to treat the ankylosing spondylitis) for one month following one month of therapy because of infections in the mouth. Plaintiff reported continuing pain that narcotics did not relieve. He also reported a recent diagnosis of sleep apnea. He reported persistent swelling and pain in his feet. On examination, Dr. Gillespie noted swollen and tender joints in his hands, tenderness in his wrists, and decreased range of motion in the hips and shoulders. Dr. Gillespie's assessment was "ankylosing spondylitis in setting of coronary artery disease [status post myocardial infarction] but no [congestive heart failure]." (AR 797). Dr. Gillespie also suspected peripheral arthritis. Dr. Gillespie directed Plaintiff to resume Enbrel in two weeks and advised that Plaintiff may need three to six months of therapy to notice a benefit. *Id.*

Plaintiff argues that, while the ALJ cited some of Dr. Gillespie's findings, the ALJ failed to consider the diagnosis of ankylosing spondylitis either at step two or anywhere else in the sequential analysis. At step two of the sequential analysis, the ALJ must determine whether the claimant has an impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). "As long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process." *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010) (citing 20 C.F.R. § 404.1523; *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th

Cir. 2003)). Thus, the step two determination is "merely a threshold requirement." *Id.* (quoting *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999)). In this case, the ALJ identified several severe impairments at step two and proceeded through the sequential analysis. Therefore, any failure to identify ankylosing spondylosis in particular as a severe impairment at step two is harmless.

Moreover, although the ALJ did not specifically discuss the *diagnosis* of ankylosing spondylosis, the ALJ did consider and accommodate Plaintiff's pain, the main symptom of Plaintiff's ankylosing spondylosis, in the RFC determination. (AR 18-29). In his reply brief, Plaintiff argues that the ALJ could not have accounted for the ankylosing spondylosis because the ALJ did not mention it by name; Plaintiff is being overly technical. The ALJ fully considered the actual effects of and limitations caused by Plaintiff's ankylosing spondylosis. If the ALJ had specifically identified ankylosing spondylosis by name as a diagnosis but then failed to consider the limitations caused by the ankylosing spondylosis, Plaintiff would justifiably cry foul. This is not the case here.

The ALJ discussed the reports, symptoms, and findings contained in the medical records that relate to Plaintiff's pain and to ankylosing spondylosis, from when it was initially suspected through diagnosis and ongoing treatment. The ALJ discussed Plaintiff's treatment with sacroiliac joint injections beginning in September 2011. Next, the ALJ discussed the xrays taken of the cervical spine on January 29, 2012, which led to a lumbar spine MRI done on January 27, 2012. The ALJ noted that the January 27, 2012 MRI "showed lumbar spondylosis but without any evidence of central canal stenosis or focal lumbar disc protrusion. There was a protrusion at T10-T11 but this was suspected as costovertebral arthritis." (AR 23). The ALJ noted that, "[u]pon learning that the claimant was HLA B27 positive, a second review of the MRI was discussed and possible evidence of a T1 endplate change was discussed, though this was not confirmed and could also have

represented subtle evidence of a spondylitis." *Id*. Based on these objective findings, the ALJ concluded that "the MRI clearly establishes some degeneration of the claimant's spine, such as has been accommodated in the residual functional capacity." *Id*.

The ALJ then discussed Dr. Gillespie's January 2012 report, contrasting Plaintiff's assertions of severe pain with Dr. Gillespie's findings of only some difficulty with range of motion. The ALJ followed with an analysis of Plaintiff's treatment at the pain clinic with Dr. Novoseletsky in 2012, Plaintiff's minimal attendance at physical therapy, and his failure to continue physical therapy. The ALJ then discussed Dr. Gillespie's February, April, and August 2012 treatment records. Finally, the ALJ addressed Plaintiff's September 20, 2012 emergency room treatment, at which he was found to have "normal extremities with adequate strength and full ROM" with "no lower extremity swelling or edema." (AR 25 (quoting (AR 887))).

Plaintiff does not identify any medical evidence demonstrating limitations from the ankylosing spondylosis that the ALJ failed to consider. This is not a case in which the ALJ ignored an enter line of evidence. *See Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012). The ALJ did not commit reversible error at step two or in incorporating limitations caused by ankylosing spondylosis.

### B. Residual Functional Capacity

The RFC is a measure of what an individual can do despite the limitations imposed by his impairments. *Young*, 362 F.3d at 1000; 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *Diaz*, 55 F.3d at 306 n.2. The RFC is an issue at steps four and five of the sequential evaluation process and must be supported by substantial evidence. SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996); *Clifford*, 227 F.3d at 870.

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing' basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p at *1. "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, at *3. The relevant evidence includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *Id.* at *5. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id*.

Plaintiff argues that the ALJ erred in formulating the RFC, first by improperly weighing the opinions of his treating physicians and second by considering Plaintiff's right upper extremity limitations inconsistently. The Court considers each in turn.

1.    *Weight to Treating Physicians' Opinions*

An ALJ must give the medical opinion of a treating doctor controlling weight as long as the

treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record . . . . When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons . . . for the weight we give to your treating source's opinion.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Hofslien v. Barnhart*, 439 F.3d 375, 376

(7th Cir. 2006); SSR 96-8p; SSR 96-2p, 1996 WL 374188 (Jul. 2, 1996). In other words, the ALJ must give a treating physician's opinion controlling weight if (1) the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques" and (2) it is "not inconsistent" with substantial evidence of record. *Schaaf*, 602 F.3d at 875.

The factors listed in paragraphs (c)(2)(i) through (c)(6) are the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors such as the familiarity of a medical source with the case. 20 C.F.R. §§ 404.1527(c); 416.927(c). "[I]f the treating source's opinion passes muster under [§ 404.1527(c)(2)], then there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it." *Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011) (internal quotation marks omitted) (quoting *Hofslien*, 439 F.3d at 376). An ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ gives good reasons. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Schaaf*, 602 F.3d at 875; *Skarbek*, 390 F.3d at 503.

Plaintiff argues that the ALJ did not properly weigh the opinions of treating physicians Dr. Buynak and Dr. Popli because he did not apply the regulatory factors. Plaintiff also contends that the ALJ was required to recontact both physicians to resolve any inconsistencies he felt were reflected in the record.

a.      Dr. Robert Buynak

Dr. Buynak provided a letter on January 10, 2012, and again on September 11, 2012, regarding Plaintiff's physical impairments. On January 10, 2012, Dr. Buynak indicated that Plaintiff

had been his patient for a year, that Plaintiff suffers from chronic pain as a result of osteoarthritis and ankylosing spondylitis, that Plaintiff goes to a pain clinic and sees a rheumatology specialist, that he is on multiple medications for pain, that he sees a cardiologist for active coronary artery disease, and that he suffers from depression and COPD, all of which make him totally disabled from work.

In an August 7, 2012 Medical Source Statement, Dr. Buynak again opined that Plaintiff's restrictions would prevent him from sustaining work and indicated that Plaintiff had the residual functional capacity to sit for two hours in an eight-hour workday and stand or walk for two hours in an eight-hour workday and that Plaintiff would need to rest or lie down for four hours in an eight-hour workday to relieve pain. Dr. Buynak also estimated that Plaintiff would be absent from work more than three times a month.

On September 11, 2012, Dr. Buynak wrote a second letter similar to the January 10, 2012 letter, again opining that all of Plaintiff's impairments "lead to total disability from work." (AR 869).

In giving Dr. Buynak's opinion little weight, the ALJ first noted Dr. Buynak's finding of total disability based on osteoarthritis, ankylosing spondylitis, coronary artery disease, and COPD, and the significant limitations on physical activities imposed by Dr. Buynak. As to Dr. Buynak's finding of total disability, the ALJ stated that, according to SSR 96-5p, the determination of disability is reserved to the Commissioner. As to Dr. Buynak's opinions on Plaintiff's physical limitations, the ALJ wrote the following:

> While the records affirm that the claimant suffers from physical limitations arising from these severe impairments, they do not support a finding of disability or the need for greater restrictions than those already accommodated in the residual functional capacity, as discussed above. Little weight is given to Dr. Buynak's opinions as

objective physical findings document pain and some limitations in range of motion, but there is no indication that the claimant could not perform restricted unskilled work within the parameters of the residual functional capacity, which already significantly reduces him to sedentary work with a number of postural, environmental, and mental limitations.

(AR 27).

Although these statements appear to be a generic conclusion, unlike the ALJ in *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000), who did not adequately explain his reasons for rejecting the treating physician opinion, the ALJ in this case thoroughly and chronologically examined the medical evidence of record before weighing Dr. Buynak's opinions. (AR 20-26). With his examination of each medical record, the ALJ drew conclusions, noted omissions, or observed consistencies or inconsistencies with other evidence of record in the context of Plaintiff's functional limitations.

For example, after a full page summarizing Plaintiff's treatment records from August 13, 2009, through April 2011, and noting that those records were "void of any back pain complaints . . . or severe clinical findings," (AR 20-21), the ALJ detailed the May 4, 2011 examination findings of the consultative examiner, Olabode Oladeinde, M.D. The ALJ recounted that Plaintiff had a normal gait, normal vision, and no signs of swelling or tenderness in his neck. The ALJ noted Dr. Oladeinde's report that Plaintiff's lungs showed good air entry without wheezing, his heart sounded normal, and he retained full range of motion throughout his cervical, thoracic, and lumbar spine. The ALJ included Dr. Oladeinde's findings that there was no tenderness in the spine at all, there were no signs of stiffness or swelling in either of the upper extremities, Plaintiff had full range of motion in each joint in the upper extremities with full 5/5 muscle strength, Plaintiff had no difficulty using his hands and fingers for manipulative tasks, the lower extremities were devoid of any abnormality,

and Plaintiff showed no dysfunction neurologically. The ALJ also noted Dr. Oladeinde's feeling that Plaintiff "displays very poor effort with the range of motion examination. He most likely does have pain in his left shoulder, but I do not think it is to the extent that the patient may want me to believe." (AR 22 (quoting (AR 533))).

And, the ALJ did not stop with the consultative examination. The ALJ noted the mild to moderate success of sacroiliac joint injections on September 26, 2011, and October 21, 2011. As mentioned in the previous section, the ALJ discussed the January 19, 2012 cervical spine xray and the January 27, 2012 lumbar spine MRI that showed lumbar spondylosis. Acknowledging the evidence of some degeneration of Plaintiff's spine consistent with Plaintiff's complaints, the ALJ made accommodations in the RFC for a limited range of sedentary work. However, the ALJ noted that no further limitations were required as no significant evidence supported greater restrictions and no treating physician had imposed physical restrictions. The ALJ noted that Plaintiff had begun physical therapy as recommended by his pain specialist in September 2011, but that the records show the therapy lasted only for a month, from December 2011 into January 2012.

The ALJ went on to discuss the records from Plaintiff's rheumatologist, Heather Gillespie, M.D. The ALJ noted inconsistencies between Plaintiff's allegations at the hearing and his reports to Dr. Gillespie of his ability to walk. The ALJ noted that Plaintiff reported pain of 9 out of 10 but that Dr. Gillespie's physical findings showed only some difficulty with range of motion. The ALJ noted that Dr. Gillespie reported that Plaintiff's ankles were not swollen but that he had no sensitivity to light touch and that there was some swelling in the upper extremities.

After discussing records regarding treatment for chest pain, the ALJ reported that Plaintiff returned to his pain specialist on May 30, 2012. The ALJ noted that Plaintiff admitted to taking pain

medications from providers other than Dr. Novoseletsky, breaking his opioid contract with the practice. The ALJ noted that, even though Plaintiff reported back pain, Dr. Novoseletsky documented that Plaintiff was not in any acute distress, he was able to rise from a seated position easily, and he showed no impairment in ambulation. The ALJ noted that Dr. Novoseletsky recommended further therapy but that Plaintiff did not seek further therapy treatment and did not return for treatment from Dr. Novoseletsky.

Next, the ALJ discussed the treatment records from Dr. Gillespie from February, April, and August 2012. He noted that, at each visit, Plaintiff reported back pain. The ALJ recognized that, at the August 29, 2012 visit, Plaintiff exhibited decreased range of motion in his neck but that no swelling was observed in either upper extremity. The ALJ noted that Plaintiff had reduced range of motion in his shoulders, which the ALJ stated he was accommodating in the RFC. The ALJ noted that Dr. Gillespie did not impose any physical exertional restrictions.

The ALJ then discussed Dr. Buynak's August 2012 treatment notes that addressed issues related to his blood pressure, a recent oral infection, a CPAP machine for his sleep apnea, and urinary issues.

Next, the ALJ discussed the emergency room record from September 20, 2012, when Plaintiff presented with complaints of chest pain. The ALJ noted all of the essentially normal cardiac test results, the notation that Plaintiff was not in any acute distress on physical examination, and the findings that Plaintiff had no labored breathing or respiratory issues, his heart rate was normal, he exhibited symmetric reflexes in his extremities, and he exhibited "'normal extremities with adequate strength and full ROM' with 'no lower extremity swelling or edema.'" (AR 25 (quoting (AR 887))).

Finally, the ALJ discussed records regarding Plaintiff's vision and obesity and considered Plaintiff's activities of daily living. And, the ALJ weighed the opinions of state agency reviewing physicians Dr. Ruiz and Dr. Montoya who opined that Plaintiff could perform work with light exertional limits, which further contradicts Plaintiff's assertion of disability. Yet, the ALJ gave the opinions little weight because he found greater restrictions were supported by the medical evidence of record.

In his brief, Plaintiff does not acknowledge the ALJ's discussion of these medical records in the context of formulating the RFC. Rather, Plaintiff makes two specific arguments as to how the ALJ did not address the regulatory criteria in weighing Dr. Buynak's opinion. First, Plaintiff notes that the ALJ did not acknowledge that Dr. Buynak had been Plaintiff's primary care physician for two years when he completed the Medical Source Statement. Plaintiff then asserts generally that Dr. Buynak's "observations" were consistent with the all the evidence of record, including "progressive low back pain, sacroiliitis, swollen and painful joints due to ankylosing spondylitis, uncontrolled hypertension, obstructive sleep apnea, cervical spine spondylosis, and chronic obstructive pulmonary disease with recurrent infections." (Pl. Br. 15). But Plaintiff is only identifying impairments; none of Plaintiff's quoted list indicates any degree of limitation resulting from those impairments. Plaintiff then string cites twenty-three sets of pages in the administrative record; Plaintiff does not discuss, much less identify, the context of those pages. Plaintiff has not offered any analysis of which medical records support the limitations imposed by Dr. Buynak or would require greater restrictions than set forth in the RFC.

Plaintiff notes that, as Plaintiff's primary care physician, Dr. Buynak received treatment notes from hospitals and other physicians, including Plaintiff's cardiologist, rheumatologist, and

pain management physician. (Pl. Br. 15-16). But again, Plaintiff does not identify any aspects of those records, which Dr. Buynak may or may not have in fact reviewed, that support Dr. Buynak's opinion of greater limitations. Plaintiff asserts, without citation to examples in the record, that Dr. Buynak's "opinion was consistent with the findings of [Plaintiff's] other treating physicians." (Pl. Br. 16).

Second, Plaintiff argues that the ALJ did not discuss Dr. Buynak's qualifications, namely that he is board certified in Internal Medicine, attended Harvard Medical School, and completed an internship and residency in Internal Medicine at the Mayo Clinic. Yet, Plaintiff offers no argument as to why these qualifications, in light of the evidence of record, would alter the weight the ALJ gave to Dr. Buynak's opinions.

Plaintiff also contends that the ALJ should have given controlling weight to Dr. Buynak's opinions that Plaintiff's impairments "lead to total disability from work." (AR 869). However, the determination of whether Plaintiff is disabled is an administrative decision reserved for the Commissioner, and Dr. Buynak's opinion on the ultimate issue of disability, while informative, is not conclusive. *See Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010); *Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002).

Finally, Plaintiff asserted at the outset of this section of the brief that the ALJ erred by failing to recontact Dr. Buynak to "resolve any inconsistencies" before rejecting his opinion. (Pl. Br. 13). However, the regulations do not *require* the ALJ to recontact a treating physician; rather, it is one option of many the ALJ has *if* there is an unresolved inconsistency or an insufficiency of evidence. 20 C.F.R. §§ 404.1520b(c); 416.920b(c). In this case, the ALJ had no need to recontact Dr. Buynak

because he addressed all the relevant evidence of record in assessing the weight of Dr. Buynak's opinion.

The Court finds that the ALJ did not err in weighing or in explaining the weight he gave to Dr. Buynak's opinion, and the Court does not reweigh the evidence. Remand is not required.

b.    Dr. Popli

Anand P. Popli, M.D., Plaintiff's treating psychiatrist, submitted correspondence to Plaintiff's attorney dated September 24, 2012, discussing Plaintiff's mental condition. In his decision, the ALJ recognized Dr. Popli's recommendation in that letter that Plaintiff pursue disability and Dr. Popli's belief that Plaintiff could not take care of himself based on his history of depression, learning disabilities, and other physical ailments. However, the ALJ also recognized Dr. Popli's statement that he had only met with Plaintiff three times after the initial consultation on April 12, 2012.

The ALJ gave Dr. Popli's opinion little weight because of the conflicting evidence from Plaintiff's testimony and his Function Report that he retains the ability to engage in a great deal of independent activities and because of Dr. Popli's lack of evidence to support contributing factors from Plaintiff's severe physical ailments. The ALJ noted that he had incorporated mental restrictions into the RFC to accommodate Plaintiff's learning disability and moderate impairments in social functioning and ability to maintain concentration, persistence, or pace. However, the ALJ found no indications in the records that greater restrictions were warranted, even when compared with Dr. Popli's notes.

Instead, the ALJ gave great weight to the opinions of the state agency consultants. On February 28, 2011, Ken Lovko, Ph.D., completed a Psychiatric Review Technic Form as well as a

supportive Mental Residual Functional Capacity Assessment based on his review of the objective medical evidence, finding that Plaintiff had mild limitations in his ability to perform activities of daily living, moderate limitations in his ability to maintain concentration, persistence, or pace and function socially, and that he had experienced no periods of decompensation. Dr. Lovko provided a detailed discussion of Plaintiff's statements regarding his daily activities in support of his opinion. (AR 497). The ALJ found Dr. Lovko's opinion to be supported by the objective medical evidence and accommodated these limitations by restricting Plaintiff to simple work with only superficial interaction with coworkers, supervisors, and the public.

As an initial matter, Plaintiff takes issue with the ALJ's assessment of his credibility. Specifically, Plaintiff argues that the ALJ mischaracterized his testimony about his abilities to read and write, prepare and follow a grocery list, walk to the mailbox, and wash dishes. *See* (AR 19). Plaintiff argues that, if the ALJ had properly characterized this testimony, it would be consistent with Dr. Popli's opinion. (Pl. Br. 17). However, the ALJ did not err in noting the contradiction between Plaintiff's statements that support an ability to live independently and Dr. Popli's opinion that Plaintiff could not care for himself as one ground for discounting the opinion. Although Plaintiff testified that he could not write a grocery list, the ALJ noted that, in his Adult Function Report, Plaintiff indicated that he was able to live alone, do his own laundry and dishes, and would do his own grocery shopping without difficulty. Plaintiff testified that he got his GED through home study. Plaintiff also testified that he can follow a grocery list. As for walking, Plaintiff testified that he could "[p]robably [walk] to the end of the street and then stop and relax before I'd get out to it." (AR 69). When the ALJ asked Plaintiff to clarify whether that distance was approximately 50 to 100 feet, Plaintiff responded, "Right, because I can walk to my mailbox, be like that." *Id*. Plaintiff is correct

that he then testified that after walking to the mailbox, he feels nauseated and dizzy; however, he testified that was because of his high blood pressure and not because of pain. The ALJ cited sufficient record evidence to support his conclusions about Plaintiff's ability to perform daily activities. The Court does not reweigh the evidence.

Next, as with Dr. Buynak, Plaintiff argues that the ALJ failed to discuss most of the regulatory factors in assessing Dr. Popli's opinion. As to the nature and extent of the treatment relationship, which the ALJ found to be weak given that Dr. Popli had only treated Plaintiff three times, Plaintiff argues that the ALJ misunderstood the nature of the mental health treatment relationship. Plaintiff notes that he began mental health treatment at HealthLinc in June 2011 with Dr. Buynak, and, in addition to treating with Dr. Popli, Plaintiff received medication management from his primary care physician at HealthLinc and counseling for depression and anxiety by a licensed clinical social worker at HealthLinc. Plaintiff reasons that, as his treating physician. Dr. Popli had all of these records available when he authored his opinion.

However, the ALJ did not err in noting the short treatment relationship with Dr. Popli. The regulations provide, "Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion." 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i). Notably, Plaintiff does not cite any portion of Dr. Popli's treatment records themselves in support of Dr. Popli's opinion. Perhaps this is because there is very little in the administrative record from Dr. Popli. It appears that the original consultation from April 2012 and the first follow up visit are not in the record. The July 19, 2012 consultation, (AR 819-20), and the September 20, 2012 consultation, (AR 876-77), are in the record. But Plaintiff cites no portion of them. Nor does Plaintiff identify any evidence showing that Dr. Popli actually

reviewed the other treatment records from HealthLinc before giving his opinion; indeed, Dr. Popli did not make any such representation. There is no indication in the record that Dr. Popli relied on anything other than the three sessions with Plaintiff to form his opinion.

Plaintiff also contends that Dr. Popli's opinion was well-supported by other objective evidence, pointing to the report of consultative examiner Victor Rini, Psy.D. Dr. Rini diagnosed dysthymic disorder and borderline intellectual functioning. In administering the WAIS-IV, Dr. Rini found Plaintiff's verbal comprehension to be extremely low, perceptual reasoning to be borderline, working memory to be low average, and processing speed to be borderline. Dr. Rini assigned a full scale IQ of 70. Plaintiff also notes that he could not pass the test required to obtain a commercial driver's license.

However, the ALJ considered Dr. Rini's findings, concluding that they confirm borderline to low-average mental aptitude but that they do not constitute a finding of disability. Rather, the ALJ explained that he incorporated the limitation to unskilled work in the RFC to accommodate this limitation.

Also, Plaintiff does not contest the ALJ's discounting of Dr. Popli's opinion because it was based in part on his assessment of Plaintiff's physical condition: "Overall, looking at his physical issues, work history, and neuropsychiatric problems, I do not feel that he can take care of himself, and would recommend him pursuing disability." (AR 873). Because Dr. Popli cited no evidence relating to Plaintiff's physical condition on which to make that assessment, the ALJ discounted his opinion. (AR 27). Although Dr. Popli's correspondence references an enclosure, no other document was included with the letter in the administrative record; thus, there is no basis for Dr. Popli's opinions regarding Plaintiff's physical condition.

Third, Plaintiff argues that the ALJ erred by giving great weight to the reviewing physicians who never examined Plaintiff. Plaintiff reasons that it was illogical for the ALJ to discredit Dr. Popli for only having treated Plaintiff three times when the state agency physicians had never examined him. Plaintiff notes that the state physicians' opinions were made on preprinted questionnaires with check boxes, arguing that they cannot be considered substantial evidence in favor of giving Dr. Popli's opinion less weight. But these opinions are consistent with the medical evidence of record highlighted by the ALJ. In fact, the ALJ pointed out that Dr. Lovko had the opportunity to review Dr. Rini's report and the evidence of Plaintiff's statements, whereas Dr. Popli only saw Plaintiff three times. (AR 26). *See Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation.").

Finally, with no citation to law, Plaintiff argues that the opinions of the state agency consultants were not entitled to "controlling weight" because they were obsolete, as they were given in February and June 2011, which was before the records from HealthLinc that included Dr. Popli's treatment notes or Dr. Popli's opinion had been received into the medical file. But, the ALJ did not rely solely on the reviewing physicians' opinions, nor did the ALJ give them "controlling weight" as asserted by Plaintiff; the ALJ gave the opinions "great weight" as consistent with the evidence of record and relied on them as one aspect of his analysis of Plaintiff's mental health record.

The ALJ sufficiently articulated reasons for discounting Dr. Popli's opinion, and remand is not required.

*2.*     *Right Upper Extremity*

Finally, Plaintiff argues that the ALJ's decision was inconsistent with regard to Plaintiff's *right* upper extremity limitations. In the RFC, the ALJ imposed reaching limitations with regard to Plaintiff's *left* arm because of pain in his *left* shoulder: "The claimant is limited to occasional overhead reaching with the *left* upper extremity. As for all other directions, bilaterally he can reach constantly, including constant reaching overhead with the right upper extremity." (AR 18) (emphasis added). This *left* arm limitation is supported by the record of Dr. Oladeinde's consultative examination, at which Plaintiff complained of left shoulder pain. The ALJ accurately discussed Dr. Oladeinde's report at length, including Dr. Oladeinde's conclusion that Plaintiff "'likely does have pain in his *left* shoulder.'" (AR 22 (quoting (AR 533))) (emphasis added).[2] Although not noted by the ALJ, the range of motion chart completed by Dr. Oladeinde that same date identified decreased range of motion in the *left* shoulder only. (AR 534).

However, in the same paragraph of his decision, as noted by Plaintiff, the ALJ subsequently identified the *right* arm as painful: "While it is difficult to distinguish the validity of Dr. Oladeinde's opinions as to the claimant's range of motion in his shoulder, I give the claimant the benefit of the doubt that he has difficulty using his *right* upper extremity because of shoulder pain." (AR 22) (emphasis added). This is a scrivener's error, as Dr. Oladeinde repeatedly identified Plaintiff's pain as in the *left* shoulder, the RFC crafted by the ALJ is consistent with Dr. Oladeinde's report by imposing limitations on overhead reaching with the l*eft* arm, and the hypothetical the ALJ posed to the vocational expert properly incorporated an overhead reaching limitation regarding the *left* arm.

---

[2] Throughout his report, Dr. Oladeinde refers to Plaintiff's pain as in the *left* shoulder. (AR 531-33). On the Range of Motion Chart, Dr. Oladeinde reports decreased range of motion in the left shoulder. However, on one occasion in the background section, Dr. Oladeinde inaccurately describes the pain as being in the right shoulder. (AR 531).

It is logical that shoulder pain would lead to a limitation in the RFC on overhead reaching with that arm. The scrivener's error on page 22 of the record does not require remand.

Plaintiff also notes that the ALJ cited Plaintiff's testimony that he has trouble with his right hand, although the ALJ described the testimony as being about the "right hand and upper extremity." (AR 20). At the hearing, when questioned by his attorney about his hands, Plaintiff testified that he drops things that are in his right hand; Plaintiff did not mention any problems with his right arm or shoulder. (AR 76). The ALJ did not incorporate any limitations on fine or gross fingering in the RFC. This is consistent with the medical evidence cited by the ALJ, which included Dr. Oladeinde's finding at the consultative examination that Plaintiff had no signs of stiffness or swelling in either of the upper extremities, Plaintiff had full range of motion in each joint of the upper extremities with full 5/5 muscle strength retention, and Plaintiff had no difficulty using his hands and fingers for manipulative tasks including opening a jar or buttoning a shirt. (AR 22 (citing (AR 532))). The ALJ also cited the emergency room records from September 20, 2012, noting the report of normal extremities with adequate strength and full range of motion. Other substantial evidence of record supports the ALJ's RFC, such as Dr. Gillespie's January 18, 2012 treatment note that, although Plaintiff had some nodules on the extensor surface of the PIPs of the right hand there was no swelling or tenderness of the joint, the MCPs were spared, and the wrists were spared.

Although Plaintiff notes that the ALJ recognized Plaintiff's testimony about his right hand, Plaintiff does not identify any medical records that would support the addition of right hand limitations to the RFC. Moreover, the ALJ did not find Plaintiff fully credible, and Plaintiff does not contest the credibility finding. Therefore, the ALJ did not err by not incorporating a right hand limitation in the RFC. As a result, the testimony elicited from the vocational expert by Plaintiff's

attorney regarding jobs available to someone limited to occasional gross and fine finger manipulation of the dominant right hand is not applicable. (AR 95-96). Remand is not required on this issue.

## CONCLUSION

Based on the foregoing, the Court hereby **DENIES** the relief sought in the Memorandum in Opposition to Secretary's Decision Denying Plaintiff's Claim for Benefits and Request for Remand [DE 15]. The Court **DIRECTS** the Clerk of Court to enter judgment in favor of Defendant Commissioner of Society Security Administration and against Plaintiff James Anthony Fancher.

So ORDERED this 19th day of March, 2015.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record